ALB:JMH
F. #2016R01491

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

LISA DEL POZO,

              Defendant.

– – – – – – – – – – – – – –X
– – – – – – – – – – – – – –X
IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

THE PREMISES KNOWN AND
DESCRIBED AS KIND FAMILY HEALTH
(421-A FRANKLIN AVENUE,
HEMPSTEAD, NEW YORK)
(the "SUBJECT PREMISES").

– – – – – – – – – – – – – –X

# 16- 907M

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 11 2016 ★

LONG ISLAND OFFICE

TO BE FILED
UNDER SEAL

COMPLAINT &
AFFIDAVIT IN
SUPPORT OF
AN ARREST
WARRANT AND A
SEARCH WARRANT

(21 U.S.C. § 846)

EASTERN DISTRICT OF NEW YORK, SS:

        CHARLES K. BERNARD, being duly sworn, deposes and states that he is a

Special Agent with the Drug Enforcement Administration, duly appointed according to law and

acting as such.

        On or about and between January 2015 and April 2016, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant LISA DEL POZO, together with others, did knowingly and intentionally conspire to

distribute and possess with intent to distribute a controlled substance, which offense involved

substances containing Oxycodone, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Section 846)

In addition, upon information and belief, there is probable cause to believe that there is now concealed within THE PREMISES KNOWN AND DESCRIBED AS KIND FAMILY HEALTH (421-A FRANKLIN AVENUE, HEMPSTEAD, NEW YORK) (the "SUBJECT PREMISES"), which is further described in Attachment A to this affidavit and to the search warrant, the things described in Attachment B to this affidavit and to the search warrant, which constitute evidence, fruits and instrumentalities of conspiracy to distribute and possess with intent to distribute a controlled substance involving Oxycodone in violation of 21 U.S.C. § 846.

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the Drug Enforcement Administration ("the DEA") and have been since 1991.   During my career, I have been involved in the investigation of numerous cases involving the illegal possession and distribution of controlled substances, including Oxycodone, and I have participated in the execution of numerous search warrants of premises in connection with drug trafficking investigations.   I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the

---

[1]      Because the purpose of this Complaint and Affidavit is to set forth only those facts necessary to establish probable cause to arrest and to search the SUBJECT PREMISES, I have not described all the relevant facts and circumstances of which I am aware.

investigative file; and from reports of other law enforcement officers involved in the investigation.

## THE DISTRIBUTION OF CONTROLLED SUBSTANCES

2.     The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., and regulations promulgated thereunder classify controlled substances in five schedules.   Schedule I drugs, including, for example, heroin and LSD, do not have an acceptable medical use in the United States.   Schedule II through Schedule V drugs have acceptable medical uses. Substances in Schedule II, including, for example, Oxycodone (see below), have a high abuse potential.   Substances in Schedule III, including, for example, Vicodin, have an abuse potential less than those in Schedule II, but more than Schedule IV controlled substances, and so forth.   Schedule V drugs consist primarily of preparations containing limited quantities of certain narcotics and stimulant drugs.

3.     Pursuant to Title 21, United States Code, Section 829(a), except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in schedule II, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.), may be dispensed without the written prescription of a practitioner, except in emergency situations.   Moreover, pursuant 21 U.S.C. § 829(b), except when dispensed directly by a practitioner, other than a pharmacist, to an ultimate user, no controlled substance in Schedule III and IV, which is a prescription drug as determined under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.), may be dispensed without a written or oral prescription in conformity with section 503(b) of that Act (21 U.S.C. § 353(b)).

4.      The CSA Scheduling System is supplemented by the individual States according to local needs and conditions.   In New York State, a physician must prescribe Schedule II drugs via an official New York State prescription.   Information concerning transactions involving Schedule II drugs is transmitted to state authorities via computer when the drugs are dispensed by a pharmacist.

5.      In addition to the requirements imposed by New York State, physicians must obtain and maintain a registration with the United States Department of Justice's Drug Enforcement Administration ("DEA") authorizing them to prescribe all controlled substances pursuant to 21 C.F.R. § 1306.03.

6.      Pursuant to 21 C.F.R. §§ 1306.07 and 1306.21(a), narcotic drugs listed in any schedule, as well as controlled substances listed in Schedules III, IV or V that are prescription drugs as determined under the Food, Drug & Cosmetics Act, 21 U.S.C. §§ 301, et seq., may be dispensed only if prescribed by an authorized practitioner.   Schedule II controlled substances require a written prescription which must be manually signed by the practitioner or an electronic prescription that meets all DEA requirements for electronic prescriptions for controlled substances.

7.      Pursuant to 21 C.F.R. § 1306.06, a prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy.   An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA (21 U.S.C. § 829).   The person knowingly filling such a purported prescription, as well as the

person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

8.      Pharmacies in New York State are required to maintain physical copies of any prescriptions for five years, while federal law mandates that prescriptions be kept for at least two years.   Typically, pharmacies maintain these hard copies in a separate controlled substance prescription file.   Additionally, Schedule II controlled substance prescriptions are reported electronically to the New York State Bureau of Narcotic Enforcement ("NYS BNE"). The disclosure of prescription records which would be caused by the execution of a search warrant is not prohibited by the regulations promulgated under the Health Insurance Portability and Accountability Act of 1996, commonly referred to as "HIPAA," P.L. 104-191, which permit the disclosure of medical records pursuant to a court-ordered warrant.   See 45 C.F.R. § 164.512(f)(1)(ii)(A).

9.      Written prescriptions by physicians are written on what is commonly referred to as a "prescription pad."   A doctor licensed by the State of New York and registered by the DEA to write controlled substance prescriptions may order pre-printed prescription pads from New York State.   Each pad contains 100 prescriptions with a serial number, the doctor's name, a bar code, the doctor's license number, and the address used by the doctor on his/her DEA registration and their registration number.   The doctor issuing the prescription must fill in, among other things, the patient's name, the drug prescribed, and the quantity of drug prescribed.   Prescriptions can also be issued electronically by practitioners who are registered to do so.

10.     Oxycodone, a Schedule II narcotic drug, is a synthetic opioid analgesic medication generally prescribed for the relief of moderate to severe pain.   Oxycodone is currently available in time-release oral pill formulation, as well as in combination with other medications.   Oxycodone has a serious potential for abuse.   Drug abusers crush the protective time-release coating on the pill and, snort, ingest or inject it, thereby obtaining all of the drug at one time.   Oxycodone used in this fashion produces a heroin-like euphoria.   Oxycodone is a highly addictive drug.

## PROBABLE CAUSE

11.     The DEA is investigating an oxycodone distribution ring.   The investigation has established probable cause to believe that DEL POZO, together with others, has engaged in a conspiracy to unlawfully distribute oxycodone in violation of 21 U.S.C. § 846, as further set forth below.

12.     Beginning in or about March 2016, the DEA received information that DEL POZO was engaged in the unlawful distribution of oxycodone.   Specifically, the DEA learned that DEL POZO was a nurse practitioner who operated the SUBJECT PREMISES, where she issued fraudulent prescriptions for oxycodone and other controlled substances, as further detailed below.

13.     The SUBJECT PREMISES is a walk-in medical clinic offering general family practice medical services.   In New York State, a nurse practitioner may operate a facility like the SUBJECT PREMISES provided that a licensed doctor is associated with the facility.   Such a nurse practitioner may also issue prescriptions for controlled substances, including but not limited to oxycodone.

14.     The DEA obtained records from the NYS BNE for all controlled substance prescriptions issued by DEL POZO between January 2015 and April 2016.   Those records reflect that DEL POZO wrote approximately 3,116 individual prescriptions for controlled substances prescriptions for 532 individual clients.   NYS BNE records further revealed that 1,230 of these prescriptions were issued to just 49 individuals, who each received between 16 and 49 individual prescriptions.

15.     I have checked law enforcement databases for the names of these 49 individuals.   Approximately 22 of the 49 individuals have criminal histories involving arrests and/or convictions for criminal possession of and/or criminal sale of a controlled substance.

16.     Further information obtained from NYS BNE concerning prescriptions specifically involving oxycodone from among all of DEL POZO's controlled substance prescriptions for the period between January 2015 and April 2016 is summarized in the below table:

| Drug Name | Strength[2] | Prescriptions | Tablets Dispensed |
|-----------|-------------|---------------|-------------------|
| Oxycodone | <10 milligrams | 216 | 13,650 |
| Oxycodone a/k/a "Percocet"[3] | 10 milligrams | 1,082 | 85,348 |
| Oxycodone | 15 milligrams | 111 | 9,189 |
| Oxycodone | 30 milligrams | 192 | 18,220 |

---

[2]     Like many drugs, oxycodone is available in various strengths corresponding to the approximate weight of the drug contained in any individual dose or tablet.

[3]     Oxycodone can be combined in preparations with other medications. "Percocet" is the name for a controlled substance preparation containing a quantity of oxycodone and a quantity of acetaminophen (in this case, 325 milligrams of acetaminophen). Acetaminophen is a general pain and fever reducer.

17.     Based on my training and experience, including on similar cases involving the unlawful distribution of oxycodone, this pattern is consistent with the unlawful distribution of controlled substances, because of the high rate of prescriptions issued to a low number of individuals within a relatively short time frame.

18.     In or around March 2016, the DEA learned about an individual who was obtaining fraudulent controlled substance prescriptions at the SUBJECT PREMISES from DEL POZO.   This individual later agreed to serve as a confidential source ("CS-1") for the DEA.   CS-1 stated to me that CS-1 had acquired fraudulent prescriptions for oxycodone and other controlled substances from DEL POZO without a legitimate medical need, in exchange for a cash payment.   CS-1's statements concerning prescriptions issued to him by DEL POZO are corroborated by my review of the records obtained from the NYS BNE, referred to above.

19.     On May 18, 2016, CS-1 obtained a fraudulent prescription at the SUBJECT PREMISES from DEL POZO.   CS-1 was outfitted with a video and audio recording device.   I have personally reviewed the contents of the recordings made, which are summarized as follows in sum and substance, and in part.

20.     CS-1 gave DEL POZO a list of substances CS-1 wished to purchase, including but not limited to oxycodone and Percocet.   During the meeting, among other statements, DEL POZO stated to CS-1 that she was "not doing pain medicine no more," because "[w]e had the state come in and everything, it was a huge problem."   DEL POZO agreed, however, to "give it to [CS-1] this month."   DEL POZO further agreed to accept a total of $200 in exchange for the requested prescriptions, one for CS-1 and one for CS-1's significant other.   DEL POZO further stated "let me put your shit in quick so you don't have to wait[.]"

DEL POZO then issued a prescription to CS-1 for oxycodone, and gave CS-1 a prescription for Percocet in the name of CS-1's significant other.   CS-1 entered the prescriptions into her computer system and, with the assistance of a staff member, provided CS-1 with a cash receipt for $200.   At no time did DEL POZO or any of her staff members conduct any medical or physical examination of CS-1, nor of CS-1's significant other, who was not present.

21.     On July 7, 2016, CS-1 obtained another fraudulent prescription at the SUBJECT PREMISES from DEL POZO.   CS-1 was outfitted with a video and audio recording device.   I have personally reviewed the contents of the recordings made, which are summarized as follows in sum and substance, and in part.

22.     CS-1 gave DEL POZO a list of substances CS-1 wished to purchase, including oxycodone and Percocet.   During the meeting, among other statements, DEL POZO stated to CS-1 that "this is the last month . . . we're not doing pain medicine anymore . . . [W]e're doing Percocets, we're not doing those oxy's it's way too much.   The state comes in, they want charts, it's like ahhhhh!   I'm going bananas, you know?"   CS-1 asked DEL POZO to provide prescriptions for CS-1, CS-1's significant other, and a parent of CS-1.   DEL POZO agreed to provide a prescription for CS-1, but declined to provide prescriptions to the other two unless they provided urine samples, stating: "[J]ust throw both of them in the car, come, we're open late.   Both of these people, come late there'll be like nobody here and just come in . . . It's not like I'm trying to bust chops, it's not like I'm not going to give it [the prescription], but we have to, you know?   You know what I mean?"   DEL POZO agreed to provide a prescription for oxycodone to CS-1 in exchange for $100.   At no time did DEL POZO or any of her staff members conduct any medical or physical examination of CS-1.

23.     Based on my discussions with CS-1 and my review of the recordings referenced above, the patient records at the SUBJECT PREMISES appear to be maintained in both hard copy and electronic format.

24.     Based upon surveillance conducted at the SUBJECT PREMISES, I know that the SUBJECT PREMISES is located on the ground floor of a two-story yellow building with a glass window storefront.   There is a green awning above the glass window storefront that clearly reads "Kind Family Health" and which clearly bears the street number of the SUBJECT PREMISES, "421-A," and its telephone number, "(516) 280-5558."   The SUBJECT PREMISES is located on South Franklin Street in Hempstead, New York.

## DOCUMENTARY EVIDENCE LIKELY TO BE FOUND
## WITHIN THE SUBJECT PREMISES

25.     Based upon my training and experience and discussion with other experienced law enforcement officers, I know that:

a. individuals engaged in drug trafficking activities, such as those described herein, commonly keep and maintain records of drugs dispensed, customers or patients and payments received.   These records are commonly stored in a location that persons committing drug trafficking offenses perceive to be readily accessible and secure;

b. individuals involved in illegal activities tend to gain substantial wealth from those illegal activities that they attempt to conceal from law enforcement authorities; therefore individuals who wish to hide assets very often place or attempt to place assets in names other than their own to avoid detection and prevent location of these assets by Government agencies; and

c. individuals frequently use currency to make expenditures for personal expenses, for investments and for secreted assets.   These transactions may consist of the purchase of assets or the structuring of payments to avoid a transaction-reporting requirement under State or Federal law.

26.     More specifically, based upon my training and experience in drug trafficking investigations, I am aware that persons and entities involved in drug trafficking conspiracies, typically maintain items such as the following:

a. books, records, ledgers, receipts, notes, money orders, telephone numbers and/or email addresses in books or papers, which reflect the names, addresses, telephone numbers and/or email addresses and/or other identifying information of their associates.

### TECHNICAL BACKGROUND WITH RESPECT TO EVIDENCE LIKELY TO BE FOUND IN THE SUBJECT PREMISES

27.     As described above and in Attachment B, this application seeks permission to search for records and items constituting evidence, fruits or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute narcotics) that might be found on the SUBJECT PREMISES, in whatever form they are found.   One form in which the records might be found is data stored on a computer's[4] hard drive or other storage media.[5]   Thus, the

---

[4]     For purposes of the requested warrants, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

[5]     A "storage medium" for purpose of the requested warrant is any physical object

warrant applied for would authorize the seizure of computers and electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.    I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

29.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.   Electronic files downloaded to a storage medium can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

30.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten.   In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

31.    Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this

---

upon which computer data can be recorded.   Examples include external hard drives, CDs and DVDs, and flash drives.

forensic evidence can take the form of operating system configurations, artifacts from the use of an operating system or application, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

32.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

33.     As further described in Attachment B, this application seeks permission to locate not only electronic computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that establishes how the computers were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on any computer or storage medium in the SUBJECT PREMISES because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of

USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   For example, registry information, Internet search histories, configuration files, user profiles, email, email address books, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how the computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Whether data stored on a computer is evidence may depend on the context provided by other information stored on the computer and the application of knowledge about how a computer

functions.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, it is sometimes necessary to establish that a particular item is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

34.     In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to "image" the date stored on such devices.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the time required for examination, technical requirements, and the variety of forms of electronic media, as explained below:

a.      The time required for an examination.   As noted above, not all evidence takes the form of documents and files that can be easily viewed on-site. Analyzing electronic data for attribution evidence and conducting a proper forensic examination requires considerable time, and taking that much time on the SUBJECT PREMISES could be unreasonable.   Given the ever-expanding

data storage capacities of computers and storage media, reviewing such evidence to identify the items described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.   The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES.   However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      The variety of forms of electronic media.   Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

35.     In most cases, a thorough search for information that might be stored on computers and storage media often requires agents to seize such electronic devices and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to "image" the date stored on such devices.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to

ensure the accuracy and completeness of data recorded on the storage media, and to prevent the

loss of the data either from accidental or intentional destruction.   This is true because of the

time required for examination, technical requirements, and the variety of forms of electronic

media, as explained below:

36.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant

I am applying for would authorize seizing, imaging, or otherwise copying computers and

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant.   The later review may require techniques, including, but not limited to,

computer-assisted scans of the entire medium, that might expose many parts of a hard drive to

human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

WHEREFORE, your deponent respectfully requests that the defendant LISA

DEL POZO be dealt with according to law and that the search warrant for the SUBJECT

PREMISES be issued.

_____
CHARLES K. BERNARD
Special Agent
Drug Enforcement Administration

Sworn to before me this
_11_th day of October, 2016

_____
THE HONORABLE ANNE Y. SHIELDS
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

**ATTACHMENT A**
THE SUBJECT PREMISES

The SUBJECT PREMISES is located at 421 South Franklin Street in

Hempstead, New York, on the ground floor of a two-story yellow building with a glass window

storefront.   There is a green awning above the glass window storefront that clearly reads "Kind

Family Health" and which clearly bears the street number of the SUBJECT PREMISES,

"421-A," and its telephone number, "(516) 280-5558."

**ATTACHMENT B**
ITEMS TO BE SEIZED

1.      Any and all records, data and correspondence constituting evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, in any form wherever that they may be stored or found including, but not limited to:

(a) documents, information or records relating to the prescribing of oxycodone and other accompanying prescriptions, including but not limited to blank or completed prescriptions, Controlled Substance Information reports, medical records noting the same and appointment books;

(b) patient records, lists and files and related identifying information for patients who have received prescriptions for oxycodone and other accompanying prescriptions;

(c) billing and payment records, including but not limited to receipts of payments, checks, checkbooks, credit card records, invoices, shipping documentation, insurance records, ATM records, deposit and withdrawal records, bank statements, tax records, bills, cash receipt books, bookkeeping ledgers for patients/customers who have received prescriptions for oxycodone and other accompanying prescriptions;

(d) any United States currency which has been paid or given by patients to LISA DEL POZO ("DEL POZO") or any employee or contractor at the SUBJECT PREMISES to secure an appointment or to secure a prescription for oxycodone and other accompanying prescriptions.

(e) financial books and records and documents constituting, concerning, or relating to payments made for oxycodone and other accompanying prescriptions;

(f) records concerning use or disposition of cash proceeds obtained for the prescription of oxycodone and other accompanying prescriptions, including, but not limited to

bank account records, credit card records; money market accounts, checking accounts,

investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds

or bond funds;

       (g) contracts, agreements, logs, lists or papers affiliated with any medical

professional services rendered at the SUBJECT PREMISES;

       (h) All records files and resumes of employees, contractors or other medical

personnel working for or seeking work at the SUBJECT OFFICE, including, but not limited to,

any handwritten or computer files listing names addresses, telephone numbers and background

information for any and all current and former employees, contractors or other medical

personnel working for or seeking work at the SUBJECT PREMISES or for DEL POZO;

       (i) documents demonstrating the rental or ownership of SUBJECT PREMISES;

and

       (j) computers, central processing units, external and internal drives, external and

internal digital storage equipment or media, computer software, computerized digital data

storage devices, including data stored on hard disks, floppy disks, or CD/DVD Disks,

computerized printouts or computer programs, computer or data processing software or data,

and any other items that reasonably appear to contain some or all of the evidence described in

this Attachment B.

       2.    Agents searching for the items described above are authorized to search

any computers or digital media at the SUBJECT PREMISES and to copy all data stored on such

computer(s) or media in order to extract and examine the above described information.   If the

files and records described in this attachment cannot be read and understood without the

software or programs that created those files or records, agents are authorized to seize such

software and any documentation and manuals that describe the software and give instructions on its installation and use. Agents are authorized to seize such software and any documentation and manuals that describe the software and give instructions on its installation and use. Agents are authorized to make complete images of computer drives and digital storage media for later analysis or to seize such computer and remove it to a laboratory setting for a sufficient period of time to obtain access to, search for, and recover the files and records described above.

       3.    Agents are directed to copy or digitally scan any seized patient medical records within thirty days of the seizure and provide a copy of these patient medical records to DEL POZO or an authorized representative. During the thirty-day period allowed to copy the medical records, if DEL POZO needs a particular patient's record, an authorized representative of DEL POZO may contact a member of the investigative team during business hours to obtain a copy of the medical record within 48 hours of the request. Should an individual patient need access to a medical file during the copying period, the patient may contact a member of the investigative team during business hours. Upon the submission of a valid patient release form to a member of the investigative team, the patient will be provided a copy of the medical file within 48 hours. In the event of an emergency, the treating facility or physician may contact a member of the investigative team to obtain a copy of the patient's medical file as soon as practicable. At the execution of the search warrant, agents are directed to post a notice on the door of the SUBJECT PREMISES that will allow both DEL POZO and patients to contact members of the investigative team to obtain patient files as described above.

       4.    Within thirty days of the seizure of any data contained within a computer, hard drive or digital media, agents are directed to provide a copy of the seized data to DEL

POZO or an authorized representative.   At the execution of the search warrant, agents are directed to provide a telephone number to DEL POZO to contact members of the investigative team regarding securing a copy of seized digital data.

   5. Any and all controlled substances and packaging (including prescription pill bottles), including, but not limited to Oxycodone.

   6. Entry keys, safe deposit keys, vehicle keys.

   7. Photographs and/or video, in particular photographs and video of assets and/or controlled substances, and/or of co-conspirators or documenting office visits.

   9. Documents relating to the existence and rental of safe deposit boxes and keys to safe deposit boxes including other modes of access to safes, containers or cabinets, locked or unlocked, containing items described above; and

   10. All text messages, email or other communications concerning the distribution of oxycodone, sales and collection.

   11. All digital or computer records containing any of the above-described information.   This also includes all copies of the information described above that may be maintained on premises as archive or backup copies, all of which constitute evidence, fruits and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846.